IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BRANDON K.,                          )
                                     )
            Plaintiff,               )
                                     )
     v.                              )   1:22CV1041
                                     )
MARTIN J. O'MALLEY,[1]               )
Commissioner of Social Security,     )
                                     )
            Defendant.               )

MEMORANDUM OPINION AND ORDER
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Brandon K. ("Plaintiff") brought this action pursuant to Section 1631(c)(3) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claim for Supplemental Security Income ("SSI") under Title XVI of the Act. The Parties have filed cross-briefs, and the administrative record has been certified to the Court for review.

I.   PROCEDURAL HISTORY

Plaintiff initially received SSI benefits based on disability as a child. (Tr. at 151.)[2] As required by law, the agency redetermined Plaintiff's eligibility for benefits under the rules for determining disability in adults when Plaintiff turned 18. On October 25, 2019, it was

---

[1] On December 20, 2023, Martin J. O'Malley was sworn in as Commissioner of Social Security, replacing Acting Commissioner Kilolo Kijakazi. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Martin J. O'Malley should be substituted for Kilolo Kijakazi as Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 405(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2] Transcript citations refer to the Sealed Administrative Record [Doc. #4].

determined that Plaintiff was no longer disabled, and that decision was upheld upon reconsideration. (Tr. at 151, 179-81.) Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 217-20.) On May 19, 2021, Plaintiff, represented by an attorney, appeared and testified at the subsequent telephonic hearing, at which both Plaintiff and an impartial vocational expert testified. (Tr. at 151.) Following the hearing, the ALJ issued a decision concluding that Plaintiff was not disabled within the meaning of the Act. (Tr. at 160.) However, in an order dated January 18, 2022, the Appeals Council vacated the ALJ's decision and remanded the case for a new hearing. (Tr. at 15, 167-74.) Accordingly, on May 31, 2022, the ALJ held a video hearing at which Plaintiff was again represented by an attorney and during which both Plaintiff and an impartial vocational expert testified. (Tr. at 15.) In a decision dated June 9, 2022, the ALJ again concluded that Plaintiff's disability ended on October 25, 2019, and that Plaintiff had not become disabled again since that date. (Tr. at 26.) On October 4, 2022, the Appeals Council denied review of that decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review. (Tr. at 1-6.)

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the

correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets and quotation omitted).

"Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (internal quotation omitted). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472 (internal brackets and quotation omitted). "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). "Under this process, the

3

Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, the claimant is disabled. Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain)." Hines, 453 F.3d at 562-63.

4

as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III.     DISCUSSION

As set out above, Plaintiff received SSI benefits as a child. Following the redetermination after he became an adult, the Social Security Administration found that he was no longer disabled under the Act as of October 25, 2019. (Tr. at 17.) Notably, the first step of the sequential evaluation process does not apply in redetermination cases. See 20 C.F.R. § 416.987(b). The ALJ therefore proceeded to step two, where she determined that Plaintiff suffered from the following severe impairments:

> [R]emitting, relapsing multiple sclerosis; bilateral carpal tunnel syndrome; lumbar radiculopathy; cervical radiculopathy; peripheral neuropathy; cervical degenerative disc disease and bulging; lumbar degenerative disc disease and degenerative joint disease; and type I diabetes mellitus and neuropathy[.]

(Tr. at 17.) The ALJ found at step three that none of these impairments, individually or in combination, met or equaled a disability listing. (Tr. at 18-21.) Accordingly, the ALJ

5

determined that Plaintiff could perform light work with the following, non-exertional limitations:

> [Plaintiff] can occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; can stand and/or walk 4 hours; can sit for 6 hours; frequently push, pull, and operate hand controls with the bilateral upper extremities; frequently climb ramps and stairs; occasionally stoop, kneel, crouch, crawl, and balance; frequently handle and finger with the bilateral upper extremities; can tolerate frequent exposure to extreme cold, extreme heat, concentrated dusts, fumes, odors, and gases; no climbing ladders, ropes, or scaffolds; no exposure to hazards, such as unprotected heights and large moving machinery; able [to] understand, remember, and carry out simple instructions; able to stay on task and to sustain attention and concentration for 2 hour periods in order to complete simple, repetitive, routine tasks; [can] work in a setting that does not require strict production quotas or a steady fast pace (no high speed conveyor belt assembly line work); able to interact occasionally with the public, but not able to provide direct customer service; can tolerate occasional changes in the work setting and duties; and will need an unscheduled 15 break during the work day.

(Tr. at 21.) At step four of the analysis, the ALJ found that Plaintiff had no past relevant work. (Tr. at 25.) However, the ALJ concluded at step five that, given Plaintiff's age, education, work experience, and RFC, along with the testimony of the vocational expert regarding those factors, Plaintiff could perform other jobs available in the national economy and therefore was not disabled under the Act. (Tr. at 25-26.)

Plaintiff now contends that the ALJ erred in three respects when assessing Plaintiff's RFC. Specifically, he argues that the ALJ erred by (1) "failing to account for Plaintiff's need to take regular breaks from activity due to chronic fatigue from multiple sclerosis ('MS'),'' (2) "failing to perform a function-by-function evaluation of Plaintiff's contested and relevant abilities to stand and walk," and (3) failing to properly evaluate "the medical opinion of treating neurologist Dr. Andreas Runheim." (Pl.'s Br. [Doc. #12] at 1.) After a thorough review of

6

the record, the Court agrees that Plaintiff's third contention merits remand for the reasons discussed below. Plaintiff's first two claims are impacted by the ALJ's considerations of Dr. Ruhnheim's opinion, and can be considered further on remand and need not be separately addressed at this time.

With respect to the opinion evidence, for Title XVI claims that are filed, or considered filed, before March 27, 2017, ALJs evaluate the medical opinion evidence in accordance with 20 C.F.R. § 416.927(c).[4] See Brown v. Comm'r Soc. Sec. Admin., 873 F.3d 251, 255 (4th Cir. 2017); Testamark v. Berryhill, 736 F. App'x 395, 398 n.1 (4th Cir. 2018). "Medical opinions" are "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Brown, 873 F.3d at 255 (internal quotation omitted). While the regulations mandate that the ALJ evaluate each medical opinion presented to her, generally "more weight is given to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you." Brown, 873 F.3d at 255 (internal quotation omitted). And, under what is commonly referred to as the "treating physician rule," the ALJ generally accords the greatest weight—controlling weight—to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to:

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be

---

[4] As noted above, Plaintiff was found disabled as a child, and his claim was redetermined after he turned 18 in 2014. His filing date is therefore considered the day before his 18th birthday, which would be November 23, 2014. (Tr. at 17, 168, citing HALLEX I-5-3-30 IV.B.Note.)

7

obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 416.927(c)(2). However, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with other substantial evidence in [the] case record," it is not entitled to controlling weight. 20 C.F.R. § 416.927(c)(2); see also Social Security Ruling 96-2p, Policy Interpretation Ruling Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions, SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996); Brown, 873 F.3d at 256; Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178.[5] If it is not given controlling weight, the opinion must be evaluated and weighed using all of the factors provided in 20 C.F.R. § 416.927(c)(2)-(c)(6), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion.

The Fourth Circuit confirmed the application of the treating physician rule in Arakas v. Commissioner, Social Security Administration, 983 F.3d 83 (4th Cir. 2020) and Dowling v. Commissioner of Social Security, 986 F.3d 377 (4th Cir. 2021). In Arakas, the Fourth Circuit

---

[5] For claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 416.920c. However, the claim in the present case was filed before March 27, 2017, and the Court has therefore analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

"emphasized that the treating physician rule is a robust one: 'The opinion of a claimant's treating physician must be given great weight and may be disregarded only if there is persuasive contradictory evidence.'" Arakas, 983 F.3d at 107 (internal brackets omitted) (quoting Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987)). Thus, "the opinion *must* be given controlling weight *unless* it is based on medically unacceptable clinical or laboratory diagnostic techniques or is *contradicted* by the other substantial evidence in the record." Id. Similarly, in Dowling, the Fourth Circuit emphasized that even if a "medical opinion was not entitled to controlling weight, it does not follow that the ALJ had free reign to attach whatever weight to that opinion that he deemed fit. The ALJ was required to consider each of the six 20 C.F.R. § 404.1527(c) factors before casting [treating physician] opinion aside." Dowling, 986 F.3d at 385. "While an ALJ is not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating physician, it must nonetheless be apparent from the ALJ's decision that he meaningfully considered *each* of the factors before deciding how much weight to give the opinion." Id.

In this case, Plaintiff presented opinion evidence from Dr. Andreas Runheim, at Salem Neurological Center. (Tr. at 1076-78.) Dr. Runheim was Plaintiff's treating neurologist for his multiple sclerosis, and the record reflects that Plaintiff had been seeing Dr. Runheim for many years, with treatment records for visits every 6 months, sometimes more frequently, and with at least 14 visits from 2017 through 2022. Dr. Runheim's opinion is dated May 12, 2021, and in that opinion Dr. Runheim relied on an October 5, 2020 MRI of Plaintiff's cervical spine. According to Dr. Runheim's opinion letter, the 2020 MRI showed "multiple T2 hyperintense cervical cord lesions" consistent with Plaintiff's diagnosis of multiple sclerosis

9

(Tr. at 1076), and Dr. Runhiem's records reflect that Plaintiff has "spinal cord predominant" multiple sclerosis. Dr. Runheim's opinion letter also confirms that the 2020 MRI showed "cervical cord volume loss suggestive of chronic encephalomalacia." (Tr. at 1076.) Dr. Runheim further confirmed that the 2020 MRI showed "moderate to high grade bilateral neural foraminal stenosis at multiple levels in the cervical spine with central canal stenosis." (Tr. at 1077.) Dr. Runheim opined that Plaintiff could not stand and walk more than two hours in a day, could not perform handling or fingering more than three hours a day, and would not have the stamina to work on a regular and continuous basis as a result of his MS-related symptoms. (Tr. at 1077.)

> In her decision, the ALJ addressed this opinion evidence as follows:
>
> In May 2021, Andreas Runheim, M.D., opined that the claimant is unable to stand and walk for more than 2 hours per day, perform bilateral handling and fingering for three hours or more, and that he would have significant fatigue and difficulties with stamina that would prevent him from working a continuous 8-hour day. This is given little weight, as it is inconsistent with, and unsupported by, the provider's own office records and examination findings, which indicate that the claimant is far less limited as well as the overall medical record as discussed above.

(Tr. at 24) (internal citation to record omitted). Thus, the reason given for rejecting Dr. Runheim's opinion was that it was inconsistent with and unsupported by (1) Dr. Runheim's office records and examination findings; and (2) the overall medical record discussed in the decision. (Tr. at 24.) However, as to the first of these rationales, it is not clear how Dr. Runheim's opinion is inconsistent with or unsupported by his own treatment records. The treatment records reflect that Plaintiff saw Dr. Runheim every six months related to his multiple sclerosis and fatigue, and at those visits Plaintiff continued to raise neck pain, back

10

pain, limb weakness, numbness, tingling, and fatigue, and examinations reflected an abnormal gait and ataxia.[6] (Tr. at 604, 608, 620, 623, 624, 724, 726, 763, 764, 852, 853, 855, 860, 992, 1411, 1416, 1423, 1428).[7] These records reflect that in September 2020, and into 2021, Plaintiff began complaining of increasing back and neck pain, and Dr. Runheim ordered an updated MRI. (Tr. at 860-61, 992, 1411.) That October 2020 cervical MRI reflects cervical cord lesions related to his multiple sclerosis with "cervical cord volume loss suggestive of chronic encephalomalacia."[8] (Tr. at 1000). In addition, the MRI reflects:

> Chronic degenerative changes with posterior disc bulge and uncovertebral hypertrophy contribute to moderate to high-grade bilateral foraminal stenosis at C3-4, high-grade bilateral foraminal stenosis at C4-5,[] and [] mild to moderate bilateral foraminal stenosis at C5-6 and C6-7. There is also central canal stenosis which appears to be secondary to a combination of congenital spinal canal narrowing as well as posterior disc bulges, especially at C3-4, C4-5, C5-6, and C6-7.

(Tr. at 1000.) Dr. Runheim saw Plaintiff again in December 2020 to review the MRI, and noted that Plaintiff's neck and back pain were getting worse, with numbness, tingling, and weakness in his legs. (Tr. at 992.) In light of the findings on the MRI, Dr. Runheim referred

---

[6] "Ataxia describes poor muscle control that causes clumsy movements. It can affect walking and balance, hand coordination, speech and swallowing, and eye movements. Ataxia usually results from damage to the part of the brain called the cerebellum or its connections. The cerebellum controls muscle coordination. Many conditions can cause ataxia, including genetic conditions, stroke, tumors, multiple sclerosis, [and] degenerative diseases." Ataxia, Mayo Clinic (Jan. 30, 2024), https://www.mayoclinic.org/diseases-conditions/ataxia/symptoms-causes/syc-20355652.

[7] The records are more limited for Plaintiff's telehealth visits during the COVID-19 pandemic in late 2020 and early 2021, since those telehealth visits do not reflect a physical examination, although they still note Plaintiff's complaints of pain and fatigue.

[8] Encephalomalacia is the "softening of the brain due to degenerative changes in nervous tissue." Encephalomalacia, Merriam-Webster, https://www.merriam-webster.com/medical/encephalomalacia (last visited Mar. 28, 2024).

Plaintiff to a neurosurgeon, Dr. Wesley Hsu, who saw Plaintiff in January 2021. (Tr. at 940-44.) At intake, Plaintiff described his pain and limitations in detail. (Tr. at 986-90) and Dr. Hsu summarized Plaintiff's presentation as:

> a right hand dominant 24-yr-old male referred for evaluation of neck pain. He is accompanied by his mother. He has past medical history of hypothyroidism and pseudo-hypoparathyroidism, multiple sclerosis, Diabetes Mellitus Type I diagnosed at age of 10, has a insulin pump and follows with endocrinology, pes planus deformity bilateral lower extremities. He reports neck pain and low back pain for many years that has progressed. Neck and low back pain constant 5/10 neck can radiate into bilateral upper extremities or down the spine into lower lumbar where it encompasses the entire lumbar area bilateral. He denies any focal weakness of arms or legs. He reports numbness in fingers for a long time. He denies any bowel/bladder dysfunction. He has had therapy in the past without lasting benefit, takes hydrocodone morning and night. Balance difficulty for many years along with the bilateral foot pain seen orthopedics in past.

(Tr. at 940.) On examination, Dr. Hsu noted his "short stature and short appendages not able to stand on toes is off balance, not able to walk on heels." (Tr. at 944.) After examination and review of the imaging, Dr. Hsu set out the treatment plan as follows:

> We reviewed the surgical details and postoperative expectations typical of a C3-7 laminectomy and fusion. I also considered an anterior C3-7 ACDF. Postsurgical options have [their] pluses and minuses which we discussed []. We reviewed all prior imaging relevant to the clinical course, including cervical MRI demonstrating moderate to severe spinal cord stenosis from C3-C7. This is progressed since the initial MRI in [the] system. [It] is clear that he will need cervical decompression at some point in his life. However, surgery can potentially be quite morbid. I do not think a decompression and fusion will help his neck pain. He wants to be followed closely instead of moving forward with surgery, and we will accommodate this. Warned of signs and symptoms of myelopathy. I will see him back in 4 months. He knows to go to the ER if he has any new problems.

(Tr. at 944.) Dr. Hsu provided this evaluation to Dr. Runheim in January 2021, prior to Dr. Runheim's opinion letter, and they continued to coordinate Plaintiff's care. (Tr. at 958.)

Dr. Runheim then ordered a lumbar MRI, which was conducted in March 2021, and which reflected "facet arthropathy with somewhat congenitally shortened pedicles" at L2-L3 and L3-L4, and "facet arthropathy with ligamentum flavum thickening slightly crowd the descending nerve roots contributing to relatively mild central stenosis and mild to moderate narrowing of the lateral recesses as well as mild to moderate bilateral foraminal stenosis" at L4-L5, and "congenitally shortened pedicles [that] do contribute to mild to moderate bilateral foraminal narrowing" at L5-S1. (Tr. at 1675-76.)

Dr. Hsu saw Plaintiff again in August 2021, and noted Plaintiff's Martin-Albright Syndrome (Tr. at 1636), also known as Albright hereditary osteodystrophy, a progressive parathyroid disorder, in addition to his multiple sclerosis and diabetes.[9] Dr. Hsu noted that Plaintiff presented with:

> many years of neck pain, thoracic spine pain, and lumbar spine pain. Pain exacerbates in different areas depending on what is going on at the time[.] [R]ight now it is a little worse [in his] lumbar [spine] than it is [in] his neck. He denies any arm symptoms or any radicular symptoms in his legs. . . . He has chronic numbness in his fingers unchanged. He has had balance issues for years and bilateral foot pain.

(Tr. at 1636.) Dr. Hsu again noted upon examination that Plaintiff had a short stature, short appendages, and was not able to stand on his toes without assistance or walk on his heels,

---

[9] This genetic condition causes multiple life-long issues, including defective bone development secondary to disturbances in calcium metabolism, characterized by "more than two features, especially brachydactyly, but also short stature, obesity, round face and neurobehavioral abnormalities." Diagnostic Approach to Disorder of Extraskeletal Bone Formation, Mayo Clinic (June 9, 2018), https://www.mayoclinic.org/medical-professionals/endocrinology/news/diagnostic-approach-to-disorders-of-extraskeletal-bone-formation/mac-20429760; Pediatric Metabolic Bone Disorders Clinic, Mayo Clinic, https://www.mayoclinic.org/departments-centers/childrens-center/overview/specialty-groups/pediatric-metabolic-bone-disorders-clinic (last visited Mar. 28, 2024).

which is consistent with Martin-Albright Syndrome. (Tr. at 1638.) Dr. Hsu also noted that Plaintiff's "Knowledge" was "poor" and that Plaintiff had "Abnormal comprehension." (Tr. at 1638.) With respect to the treatment plan, Dr. Hsu noted that:

> [w]e reviewed the surgical details and postoperative expectations typical of a posterior cervical laminectomy and fusion. We reviewed all prior imaging relevant to the clinical course, including cervical MRI demonstrating moderate to severe stenosis and congenital stenosis from C2-C7. There is evidence of myelomalacia throughout the cervical spine. He is neurologically intact. I think it would be best for him given his syndrome and multiple medical problems to hold off on surgery as long as possible. I will see him back regularly for routine neurological checks.

(Tr. at 1639) (emphases omitted).[10] Thus, in light of Plaintiff's Martin-Albright Syndrome and his other medical problems (including diabetes and multiple sclerosis), Dr. Hsu advised that it was best to hold off on surgery as long as possible. As noted above, Dr. Hsu provided Dr. Runheim with his records and coordinated care with Dr. Runheim.

In light of these records, it is not at all clear how Dr. Runheim's opinion is inconsistent with his treatment records. In evaluating the treatment records, the ALJ addressed an earlier 2018 MRI, but did not address the October 2020 MRI relied on by Dr. Runheim and Dr. Hsu. In addition, nothing in the ALJ's decision indicates that she recognized the interconnectedness of Plaintiff's impairments, including that his parathyroid condition, which the ALJ found non-severe at step two of the sequential analysis, was inextricably linked with his neurological and degenerative disorders. On three occasions, the ALJ cited to a single page of Dr. Hsu's

---

[10] Myelomalacia is the softening of the tissues of the spinal cord, often associated with an impaired blood supply or compression of the cord. Myelomalacia, Oxford English Dictionary, https://www.oed.com/dictionary/myelomalacia_n?tab=meaning_and_use#11943505 (last visited Mar. 28, 2024).

treatments notes as evidence of "normal" clinical findings, while ignoring the abnormal balance findings on the same page and the more than 60 additional pages of that exhibit. (See Tr. at 20, 22, 24, 1638.)

With respect to the other opinion evidence, the ALJ noted the opinion of Dr. Dorothy Linster, the state agency medical consultant at the initial level. (See Tr. at 24, 140.) Dr. Linster provided opinion evidence regarding Plaintiff's ability to stand and/or walk for up to 4 hours in an 8-hour workday, and his ability to frequently handle and finger, in addition to other postural and environmental limitations. (Tr. at 141-42.) As noted in the administrative decision, Dr. Linster issued her determination in October 2019. Accordingly, she did not have the benefit of reviewing Plaintiff's October 2020 cervical MRI or March 2021 lumbar MRI, or any of the records of Dr. Hsu or the later records of Dr. Runheim. The only medical source to take these objective test results into account was Dr. Runheim, who opined that Plaintiff could stand and walk for no more than two hours per workday, and could handle and finger no more than three hours per workday. (Tr. at 24, 1077.) The ALJ apparently recognized some of the problem with relying on Dr. Linster's opinion and assigned Dr. Linster's opinion "little weight," and specifically explained that Dr. Linster's findings were

> inconsistent with, and unsupported by, [Plaintiff's] progress reports and examination findings, which indicate that [his] ability to stoop, kneel, crouch, and crawl are somewhat more limited. For example, at times, [Plaintiff] presented with ankle swelling, ataxic gait, and erythema.

15

(Tr. at 24.)[11] The ALJ similarly noted the opinion evidence from the medical examiner Dr. Melvin Clayton in February 2020. (Tr. at 24.) Dr. Clayton also did not have the benefit of any of the October 2020 or March 2021 imaging or later medical records. Notably, the ALJ also assigned Dr. Clayton's opinion "little weight" as it was "inconsistent with, and unsupported by, [Plaintiff's treatment history, imaging studies, and examination findings." (Tr. at 24.)

As a result of these determinations, the ALJ assigned "little weight" to all of the medical opinion evidence in this case, including the opinions of Dr. Runheim and Dr. Linster and Dr. Clayton. (Tr. at 24.) In discounting this evidence, the ALJ generally noted that each opinion in question is "inconsistent with, and unsupported by" the overall medical record, including Plaintiff's treatment history, examination findings, and imaging. (Tr. at 24.) Thus, the ALJ appears to have based the RFC in this case largely, and inappropriately, on her own interpretation of the raw medical evidence, and rejected the opinion of Plaintiff's treating neurologist in a medically complex case without any other medical review of the relevant imagining and records from 2020 through 2022.

In the ALJ's discussion of the medical record, the ALJ did repeatedly state that Plaintiff "has generally presented with . . . mostly normal findings" including "normal gait." (Tr. at 22, 23, 24.) However, as Plaintiff correctly notes, many of these "normal" findings came from appointments during which Plaintiff's mobility was not tested or at issue, such as visits to the

---

[11] The ALJ determined that, in light of Plaintiff's examination findings, which included swollen ankles and walking difficulties, Plaintiff required greater postural limitations than those opined by Dr. Linster, but the ALJ failed to explain why this would not also impact the standing and walking limitations opined by Dr. Linster.

endocrinologist or dermatologist, or telehealth visits with no examination. As set out above, Plaintiff's examinations with Dr. Runheim consistently reflected abnormal gait and stance and ataxia, and the record also reflects Plaintiff's ongoing complaints to Dr. Runheim and other providers regarding neck and back pain and fatigue (Tr. at (Tr. at 604, 608, 620, 623, 624, 724, 726, 763, 764, 852, 853, 855, 860, 992, 1411, 1416, 1423, 1428, 642-44, 645, 741, 779, 792, 880, 884, 1448). The ALJ also listed Plaintiff's activities as evidence that he was less limited than alleged, noting that Plaintiff was "able to do chores or play [video] games for 30-45 minutes, make his bed, take care of his dogs, help take care of his mother, and vacuum." (Tr. at 23.) Notably, none of these abilities, as described in Plaintiff's testimony, would be inconsistent with the limitations opined by Dr. Runheim, including the 2-hour per day walking and standing limitation, the 3-hour per day handling and fingering limitation, and the MS-related fatigue and lack of stamina that would interfere with his ability to work for 8 hours per day for 5 days per week. (See Tr. at 46-49, 55.) The ALJ also cited Plaintiff's "mostly conservative treatment," but the ALJ fails to note what, if any, more extensive treatment Plaintiff may have required for his conditions. (Tr. at 23.) The ALJ noted Plaintiff's use of hydrocodone twice a day to treat pain in his back, neck, and extremities, and that, although Plaintiff would require spinal surgery in the future, it was not recommended as of January 2021. (Tr. at 23, 944, 1419, 1423.) In doing so, the ALJ failed to acknowledge that (1) Plaintiff's spinal condition had deteriorated since his previous MRI (Tr. at 944) and that (2) Plaintiff's neurologist Dr. Hsu specifically stated that the surgery "can potentially be quite morbid" given Plaintiff's conditions (Tr. at 944), and that "it would be best for [Plaintiff] given his syndrome and multiple medical problems to hold off on surgery as long as possible" (Tr. at 1639). Thus, the

17

Case 1:22-cv-01041-JEP   Document 19   Filed 03/28/24   Page 17 of 19

ALJ improperly cherry-picked "normal" examination findings and emphasized activities and treatments which had little bearing on the limitations opined by Dr. Runheim.

As set out above, the regulations applicable in this case required the ALJ to give controlling weight to Dr. Runheim's opinion as the treating physician, unless the opinion was not well supported by clinical and laboratory diagnostic techniques or was inconsistent with the other evidence in the record. Based on the records noted above, it is not clear how or why the ALJ concluded that Dr. Runheim's opinion was not well supported or was not consistent with the record. In addition, as explained by the Fourth Circuit in <u>Dowling</u>, even if the ALJ had a basis to decline giving controlling weight to Dr. Runheim's opinion, the ALJ was still required to address the remaining regulatory factors in weighing the opinion evidence. <u>Dowling</u>, 986 F.3d at 385 ("While an ALJ is not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating physician, it must nonetheless be apparent from the ALJ's decision that he meaningfully considered *each* of the factors before deciding how much weight to give the opinion."). The ALJ did not undertake such an analysis here. As noted above, the ALJ also discounted all of the medical opinion evidence of record in favor of her own interpretation of the evidence. In short, multiple "inadequacies in the ALJ's analysis frustrate meaningful review" of this case, and the matter therefore requires remand.

IT IS THEREFORE ORDERED that the Commissioner's decision finding no disability is REVERSED, and that the matter is REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner is directed to remand the matter to the ALJ for further consideration of Plaintiff's claim. Accordingly, Defendant's Dispositive

Brief [Doc. #17] is DENIED, and Plaintiff's Dispositive Brief [Doc. #12] is GRANTED to the extent set out herein. However, to the extent Plaintiff seeks an immediate award of benefits, his Motion is DENIED.

This, the 28th day of March, 2024.

                                                /s/ Joi Elizabeth Peake
                                              United States Magistrate Judge